EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Efraín Echandi Otero y otros<br><br>Peticionaria<br><br>vs.<br><br>Stewart Title Guaranty Co.<br><br>Recurrido | Certiorari<br><br>2008 TSPR 126<br><br>174 DPR _____ |

Número del Caso: AC-2006-49

Fecha: 22 de julio de 2008

Tribunal de Apelaciones:

>       Región Judicial de San Juan Panel V

Juez Ponente:

>       Hon. Héctor Urgell Cuebas

Abogado de la Parte Peticionaria:

>       Lcdo. Allan E. Charlotten Rivera

Abogada de la Parte Recurrida:

>       Lcda. Michelle Pirallo-Di Cristina


Materia: Incumplimiento de Contrato y Daños


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Efraín Echandi Otero y otros

    Peticionaria

        vs.                    AC-2006-49     *CERTIORARI*

Stewart Title Guaranty Co.

    Recurrido

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 22 de julio de 2008

El 26 de septiembre de 2003, el Sr. Efraín Echandi Otero y su esposa Nydia Rosa Guzmán presentaron una demanda sobre incumplimiento de contrato y daños y perjuicios contra Stewart Title Guaranty Company, Inc., Stewart Title of Puerto Rico, Inc., San Juan Abstract Corporation y otros, ante el Tribunal de Primera Instancia, . En la misma, alegaron que los demandados incumplieron con los términos de un contrato de seguro de título al denegarles representación legal y cubierta. Por su parte, los codemandados contestaron la demanda negando las alegaciones y aduciendo que las circunstancias del presente caso no eran indemnizables bajo los términos de la póliza. <u>Resolvemos</u>.

I

El 7 de junio de 2002, los esposos Echandi-Guzmán compraron un solar segregado de una finca matriz, propiedad de Vista Bahía Culebra, Inc. En la escritura de segregación y compraventa, la Notaria le advirtió a los compradores que se había instado un pleito civil, <u>Ramos v. Rivera</u>, en el cual se cuestionaba la legalidad de los permisos gubernamentales concedidos en relación con el proyecto Vista Bahía Culebra.[1] El mismo día en que se otorgó el documento

---

[1] La mencionada advertencia hecha por la Notaria, que consta en la escritura, lee de la siguiente forma:

> La Notaria le advierte a la PARTE COMPRADORA que ante el Tribunal de Primera Instancia, Sala Superior de San Juan, se ha presentado un pleito bajo el número civil KPE 2002-0190(904) sobre *Mandamus*, Solicitud de Orden Provisional Temporera de Cese y Desista, *Injunction* Preliminar y Permanente, Daños y Perjuicios y Sentencia Declaratoria seguido por Ana Ramos Toro y otros contra Carlos A. Rivera Bustamante y otros, donde se ha cuestionado la legalidad de los permisos gubernamentales concedidos en relación con el proyecto. Manifiesta la PARTE VENDEDORA que a esta fecha el Tribunal denegó la expedición de la orden de *Mandamus* e *Injunction* Preliminar y el pleito continúa bajo el trámite ordinario. La Notaria les ha advertido a los comparecientes que no ha tenido oportunidad de examinar el expediente legal del referido caso y que está descansando en las manifestaciones de las partes por lo que recomienda a la PARTE COMPRADORA de la conveniencia de examinar los autos del mencionado caso previo al otorgamiento de esta escritura, en cuyo caso se puede posponer el cierre para brindar la oportunidad necesaria para ello.

En un acápite anterior la Notaria le informó a los compradores sobre la conveniencia de adquirir una póliza de título que les garantizara su derecho de propiedad y les indemnizara en caso de que sufrieran una pérdida o menoscabo en el mismo. Ahora bien, dicha orientación se realizó porque

(Continúa . . .)

público, con el propósito de asegurar su derecho sobre el solar adquirido y para proveerle mercadeabilidad al mismo, los esposos Echandi-Guzmán suscribieron un contrato de seguro de título con San Juan Abstract Company mediante el cual adquirieron una póliza emitida por Stewart Title Guaranty Company a través de Stewart Title of Puerto Rico.

Un año después, el tribunal de instancia, en el caso Ramos v. Rivera, emitió una sentencia parcial en la cual declaró nula la autorización de desarrollo de Vista Bahía Culebra y, por ende, todas las transacciones realizadas referentes a la finca matriz de la cual provenía el solar adquirido por los esposos Echandi-Guzmán.[2] Tan pronto el matrimonio demandante se enteró de la sentencia dictada le informó a San Juan Abstract Company y a Stewart Title de la misma.

Mediante comunicación de 27 de febrero de 2003, el matrimonio Echandi-Guzmán solicitó a las antes mencionadas compañías aseguradoras le brindaran representación legal.

_____

la finca matriz, de donde se segregó la parcela que se le vendía a los compradores, no constaba inscrita en el Registro de la Propiedad, a pesar de que los documentos habían sido presentados. Por lo tanto, la razón para que la Notaria le recomendara a los compradores adquirir un seguro de título no respondía a la existencia del pleito sobre los permisos gubernamentales de la finca matriz.

[2] El tribunal de instancia determinó, en dicho caso, que ARPe actuó sin jurisdicción al aprobar una solicitud de desarrollo preliminar que contenía una variación de cabida que, a su vez, constituía un cambio en el distrito de zonificación. Tal poder de alterar el uso de la tierra lo posee la Junta de Planificación y no la agencia que tomó la decisión.

Además, éstos solicitaron le proveyeran toda la información que tuvieran sobre la sentencia que afectaba sus derechos. Los demandados no contestaron tales solicitudes.

Así las cosas, y para asegurar su interés propietario, el matrimonio Echandi-Guzmán intervino en el caso <u>Ramos v. Rivera</u>, en el cual solicitó y obtuvo una orden de prohibición de enajenar la finca matriz propiedad de Vista Bahía. La referida orden fue debidamente inscrita en el Registro de la Propiedad. Posteriormente, los esposos Echandi-Guzmán reclamaron, nuevamente, a San Juan Abstract y a Stewart Title, la cubierta de la póliza de seguros adquirida. Les solicitaron, a su vez, que le reembolsaran los gastos legales incurridos.

Los aquí demandados nunca contestaron tales requerimientos. Por dicha razón, los esposos Echandi-Guzmán presentaron la demanda que origina el recurso de epígrafe. Además de reclamar los gastos legales incurridos y el valor asegurado de la póliza, el matrimonio demandante adujo que el incumplimiento de los demandados les había causado profundos sufrimientos y angustias mentales, por lo cual solicitaron remuneración económica. Solicitaron, a su vez, retribución por pérdida de ingresos y que se les concedieran honorarios de abogado.

Stewart Title contestó la demanda y levantó como defensa afirmativa que el seguro de título emitido no cubría los daños reclamados. Adujeron, que los esposos Echandi-Guzmán asumieron el riesgo al adquirir la propiedad con

conocimiento de que el pleito, en el cual se impugnaron los permisos otorgados para el proyecto, estaba en proceso. Poco tiempo después, Stewart Title solicitó la desestimación de la demanda, basándose en que el seguro de título no proveía cubierta para situaciones en que los asegurados consentían o asumían el riesgo.[3] En apoyo a tal petición citó el texto de la póliza, en particular la sección que enumera las exclusiones a la cobertura. El aparte en controversia, en lo pertinente, lee como sigue:

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorney's fees or expenses which arise by reason of:
>
> 1.(a) **Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances or regulations) restricting, regulating, prohibiting or relating to** (i) the occupancy, use or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) **a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part;** or (iv) environmental protection or the effect of any violation of these laws, ordinances or governmental regulations, **except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation affecting the land has been recorded in the public records at date of Policy.**[4]

---

[3] San Juan Abstract Corporation, la compañía que llevó a cabo el estudio de título, contestó la demanda separadamente y también solicitó la desestimación de la demanda en cuanto a ella se refiere. Adujo que su función no incluía proveer seguro para pérdidas y que el estudio de título claramente informó sobre la demanda, por lo que no fue negligente.

[4] La definición de "public record" que provee la póliza es la siguiente:

(Continúa . . .)

    (b)…
2.…
**3. Defects, liens, encumbrances, adverse claims or other matters:**
**a) created, suffered, assumed or agreed to by the insured claimant;**
b)…
c)…
d)…; **or**
e)…

Stewart Title argumentó que el contrato de seguro tampoco le obligaba a representar legalmente a los demandantes. Para fundamentar su alegación, Stewart Title se refirió, nuevamente, a la póliza de seguro otorgada. Indicó que según los términos y condiciones del referido contrato, la compañía aseguradora estaba obligada a defender a un asegurado de una acción en su contra cuando las causas de acción del litigio se refieren a un defecto, gravamen, carga u otro asunto asegurado en la póliza.[5] Dicho de manera

---

…records established under states statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions from Coverage, "public record" shall also include environmental protections liens filed in the records of the clerk of the United States district court for the district in which the land is located.

[5] La cláusula a la que hace referencia Stewart Title, sobre su obligación a proveerle representación legal a los demandantes, es la siguiente:

DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.
(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without

(Continúa . . .)

simple, conforme razonó Stewart Title, la póliza específicamente excluye el pago de costas, honorarios y gastos incurridos por el asegurado en la defensa de causas de acción donde se alegan asuntos que no están cubiertos por el contrato.

Oportunamente, los esposos Echandi-Guzmán se opusieron a la desestimación solicitada. En el escrito que a esos efectos radicaron, expusieron hechos materiales que entendieron estaban en controversia. Como alternativa, solicitaron que se dictara sentencia sumaria a su favor basándose en que los hechos incontrovertidos representan una de las excepciones a las cláusulas de exclusión.

---

unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matter not insured against by this policy.

(b) [Stewart Title] shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured…

Luego de varios trámites procesales, el tribunal de instancia emitió una resolución interlocutoria en la cual determinó que los hechos del caso estaban cubiertos por la póliza del seguro de título.[6] Entendió el tribunal inferior que aunque los hechos del caso estaban excluidos por el párrafo 1(a) de las exclusiones de la póliza, <u>era de aplicación la excepción a la exclusión</u>.[7] En consecuencia, concluyó que Stewart Title había incumplido el contrato al negarse a proveer representación legal e indemnizar a los esposos Echandi-Guzmán por la pérdida que sufrieron relacionada al defecto en el título del inmueble que adquirieron. Dispuso, finalmente, que señalaría una vista para determinar la valorización de los daños.

Insatisfecho con la decisión, Stewart Title Company acudió al Tribunal de Apelaciones. En el recurso que radicara señaló, en síntesis, que incidió el tribunal de instancia al concluir que era responsable bajo la póliza a proveerle representación legal al asegurado y a indemnizarle

---

[6] A pesar de que el tribunal de instancia concluyó expresamente que no existía razón para posponer dictar sentencia sobre la reclamación y ordenó que se registrara la sentencia parcial sumaria, dicha determinación constituyó una resolución interlocutoria. Es decir, el dictamen del tribunal de instancia no es una sentencia porque no resuelve finalmente la cuestión litigiosa en forma tal que no quede pendiente nada más que la ejecución de la sentencia. Véase: <u>García v. Padró</u>, res. el 14 de julio de 2005, 2005 T.S.P.R. 105.

[7] El tribunal de instancia determinó que la presentación de la demanda era, por si mismo, un "notice" en un "public record," por lo que no aplicaba la exclusión 1(a) de la póliza.

en daños. El 28 de febrero de 2006, el foro apelativo intermedio emitió una sentencia en la cual revocó al tribunal de instancia y desestimó la demanda. Concluyó que los esposos Echandi-Guzmán suscribieron el contrato de compraventa con pleno conocimiento de la existencia y naturaleza del pleito sobre los permisos gubernamentales para la segregación de la finca matriz, razón por la cual asumieron voluntariamente y consintieron al riesgo. En consecuencia, el tribunal apelativo intermedio encontró que Stewart Title no incumplió las obligaciones que alegadamente había asumido en el contrato de seguros, toda vez que los asuntos reclamados por la demandante no estaban cubiertos por los términos y condiciones de la póliza.

Inconformes, los esposos Echandi-Guzmán acudieron --mediante recurso de apelación-- ante este Tribunal. Aducen, que procede revocar la sentencia emitida por el foro apelativo intermedio debido a que este incidió al:

> …ordenar la desestimación de la demanda de forma contraria al estado de derecho vigente referente al deber de ofrecer representación legal al asegurado.

> …ordenar la desestimación de la demanda contrario al estado de derecho vigente referente al contrato de seguros entre las partes y la interpretación del Honorable Tribunal Supremo en torno a las cláusulas de exclusión de responsabilidad.

> …obviar la doctrina vigente de _tronéis en esta jurisdicción.

> …obviar la doctrina vigente de la Buena Fe y el Deber de Lealtad.

…ordenar la desestimación de la demanda contrario a la Falsa Representación aplicable a la presente situación de hechos.

Habiendo acogido el recurso radicado como uno de *certiorari*, por ser el adecuado[8], <u>expedimos</u> el mismo. Estando en posición de resolverlo, procedemos a hacerlo.

II

La sentencia sumaria es el mecanismo procesal mediante el cual se le confiere discreción al juzgador para dictar sentencia sobre la totalidad de una reclamación o sobre cualquier controversia comprendida en ésta, sin la necesidad de celebrar una vista evidenciaria. 32 L.P.R.A. Ap. III R. 36; <u>Nissen Holland v. Genthaller</u>, res. el 7 de noviembre de 2007, 2007 TSPR 197. Procede dictar sentencia sumaria si de los documentos que acompañan la solicitud o que obran en el expediente del tribunal surge que no hay controversia real sustancial en cuanto a ningún hecho material y como cuestión

---

[8] Los Incisos (b) y (c) del Artículo 3.002 de la Ley de la Judicatura de 2003, 4 L.P.R.A. sec. 24s (b) y (c), disponen que este Tribunal tendrá jurisdicción en apelación sobre sentencias de casos civiles apelados ante el Tribunal de Apelaciones en dos instancias: (1) cuando el tribunal intermedio apelativo determine la inconstitucionalidad de una ley, resolución conjunta, resolución concurrente, regla o reglamento de una agencia o instrumentalidad pública, u ordenanza municipal; o (2) cuando se plantee la existencia de un conflicto entre sentencias del Tribunal de Apelaciones.
En el presente recurso no se presenta ninguna de las circunstancias, antes enumeradas, bajo las cuales el mismo deba ser considerado una apelación. Por tal razón, procedemos a entender en el recurso, como uno de *certiorari.*

de derecho debe dictarse sentencia a favor de la parte promoverte. López Colón v. Miranda Marín, res. el 16 de diciembre de 2005, 2005 TSPR 197.

El tribunal no dictará sentencia sumaria cuando: (1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones alternativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; (4) como cuestión de derecho no procede. Vera Morales v. Bravo Colón, 161 D.P.R. 308 (2004). Asimismo, hemos resuelto que, en el sano ejercicio de su discreción, un tribunal no debe resolver sumariamente casos complejos o casos que envuelven cuestiones de interés público. Jusino v. Walgreens, 155 D.P.R. 560 (2001).

En conclusión, el uso de este mecanismo debe ser mesurado, porque su utilización irrestricta constituiría una violación al debido proceso de ley, al despojar a un litigante de su día en corte. E.L.A. v. Cole Vázquez, res. el 13 de abril de 2005, 2005 TSPR 46.

III

El negocio de seguros es uno revestido de un alto interés público. Molina Texidor v. Centro Recreativo Plaza Acuática, res. el 21 de noviembre de 2005, 2005 T.S.P.R. 172. Por tal razón ha sido regulado ampliamente por el Estado, principalmente mediante el Código de Seguros de Puerto Rico, Ley Núm. 77 del 19 de junio de 1957, 26

L.P.R.A. sec. 101 et seq. El referido estatuto establece la norma de hermenéutica aplicable a la interpretación de las pólizas de seguros. La misma dispone que todo contrato de seguro debe interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido o modificado por aditamento, endoso o solicitud que sean añadidos a la póliza para formar parte de ésta. Artículo 11.250 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 1125. Véase, además: Molina Texidor v. Centro Recreativo Plaza Acuática, ante; Díaz Ayala v. E.L.A., 153 D.P.R. 675 (2001). Las normas generales del Código Civil, sobre interpretación de los contratos, aplicarán sólo de manera supletoria. Banco de la Vivienda v. Underwriters, 111 D.P.R. 1 (1981); Molina Texidor v. Centro Recreativo Plaza Acuática, ante; Artículos 1233 a 1241 del Código Civil, 31 L.P.R.A. secs. 3471-3479.

Al igual que todo contrato, el contrato de seguro constituye la ley entre las partes. López Castro v. Atlantic Southern Ins. Co., 158 D.P.R. 562 (2003); Monteagudo Pérez v. E.L.A., res. el 16 de agosto de 2007, 2007 TSPR 153. Sin embargo, hemos resuelto que el mismo es un contrato de adhesión[9], por lo cual debe interpretarse liberalmente en beneficio del asegurado. Molina Texidor v. Centro Recreativo Plaza Acuática, ante; Monteagudo Pérez v. E.L.A., ante. No

_____

[9] Un contrato de adhesión es aquel en que una sola de las partes dicta las condiciones del contrato, condiciones que ha de aceptar la otra parte contratante. Véase: Zequeira v. C.R.U.V., 83 D.P.R. 878, 880 (1961).

obstante, si los términos del contrato de seguro son claros, específicos y no dan margen a ambigüedades o diferentes interpretaciones, se hará valer la clara voluntad de las partes. Quiñones López v. Manzano, 141 D.P.R. 139 (1996); López Castro v. Atlantic Southern Ins. Co., ante; Cooperativa de Ahorro y Crédito Oriental v. Oquendo Camacho, 158 D.P.R. 723 (2003). Véase, además: Artículo 1233 del Código Civil, 31 L.P.R.A. sec. 3471.

Por otro lado, los términos de las pólizas de seguro deben ser generalmente entendidos en su más corriente y usual significado, sin atender demasiado al rigor gramatical, sino al uso general y popular de las voces. Morales Garay v. Roldán Coss, 110 D.P.R. 701 (1981); Molina Texidor v. Centro Recreativo Plaza Acuática, ante. De esta manera, el asegurado que adquiere una póliza tiene derecho a confiar en la cubierta que se le ofrece leyendo las cláusulas del contrato a la luz del sentido popular de sus palabras. *Id*; Barrera v. Tribunal, 87 D.P.R. 227 (1963); Pagán Caballero v. Silva Ortíz, 122 D.P.R. 105 (1988).

El propósito de todo contrato de seguros es la indemnización y protección en caso de producirse el suceso incierto previsto en el mismo. Artículo 11.250 del Código de Seguros, 26 L.P.R.A. sec. 1125. Al determinar cuáles son los riesgos cubiertos por una póliza de seguro es necesario considerar si en el contrato figura una cláusula de exclusión. Monteagudo Pérez v. E.L.A., ante. Estas cláusulas tienen el propósito de limitar la cubierta establecida en el

acuerdo principal y disponen que el asegurador no responderá por determinados eventos, riesgos o peligros. *Id.* Por dicha razón, hemos resuelto que las exclusiones se han de interpretar restrictivamente a favor del asegurado, para así cumplir con el propósito de todo seguro de ofrecer la mayor protección a la persona asegurada. R. Cruz, Derecho de Seguros, San Juan, Publicaciones JTS, 1999, pág. 167; Molina Texidor v. Centro Recreativo Plaza Acuática, ante; Marín v. Internacional Ins. Co., 137 D.P.R. 356 (1994); Rivera Robles v. Ins. Co. of Puerto Rico, 103 D.P.R, 91 (1974). No obstante, y acorde con la norma general, si una cláusula de exclusión aplica claramente a determinada situación, la aseguradora no está obligada a responder por los riesgos expresamente excluidos. Marín v. American International Ins. Co. of P.R., 137 D.P.R. 356 (1994); Molina Texidor v. Centro Recreativo Plaza Acuática, ante.


IV

Constituye una práctica usual que los contratos de seguros, además de disponer para indemnización en daños en algunas circunstancias, incluyen cláusulas para establecer la obligación de la compañía aseguradora de proveer representación legal al asegurado. PFZ Properties v. General Accident Ins. Co., 136 D.P.R. 881 (1994). Como expresáramos antes, el propósito de una póliza de seguro es brindar protección al asegurado, razón por la cual el deber de representarlos legalmente es parte esencial de la cubierta

que se contrata con la compañía aseguradora. *Id*; Pagán Caraballo v. Silva Ortíz, 122 D.P.R. 105 (188).

Reiteradamente, este Tribunal ha resuelto que el deber de una aseguradora de proveer representación legal al asegurado es más extenso que la obligación de indemnizar por daños, en la medida en que éstos estén cubiertos por una póliza de seguros. Vega v. Pepsi- Cola Bot. Co., 118 D.P.R. 661 (1987); Pagán Caraballo v. Silva Ortíz, 122 D.P.R. 105 (1988); PFZ Properties v. General Accident Ins. Co., ante. Este deber existe, en algunas circunstancias, aun cuando la aseguradora no esté obligada a indemnizar los daños causados por el asegurado a un tercero. *Id.* Cualquier duda sobre si existe el deber de asumir la defensa en un caso en particular tendrá que ser resuelta a favor del asegurado. *Id.*

El deber del asegurador de defender al asegurado de acciones bajo la cubierta del contrato se mide, en primer lugar, por las alegaciones del demandante. PFZ Properties v. General Accident Ins. Co., ante. Éstas tienen que describir hechos que coloquen el daño dentro de la cubierta de la póliza, independientemente de la responsabilidad que en última instancia tenga el asegurado para con el demandante. *Id*; Fernández v. Royal Indemnity Co., 87 D.P.R. 859 (1963).

Así, la obligación de la compañía aseguradora de asumir la representación legal de su asegurado surgirá cuando de una interpretación liberal de las alegaciones surja la posibilidad de que el asegurado esté protegido por la póliza

expedida, independientemente de cuál sea la adjudicación final del caso. Ahora bien, si la cubierta de póliza claramente excluye los daños reclamados en las alegaciones no podrá imponerse a la aseguradora el deber de defender. Martínez Pérez v. U.C.B., 143 D.P.R. 554 (1997); PFZ Properties v. General Accident Ins. Co., ante. Según lo antes expuesto, cualquier duda sobre si existe el deber de proveer defensa debe resolverse a favor del asegurado; sin embargo, una reclamación que claramente queda excluida de la cubierta de la póliza no se convierte en un riesgo cubierto en virtud de unas alegaciones diseñadas para que se ajusten al lenguaje de la póliza. Aguilar Pérez v. Universal Insurance Company, ante, citando a Coach on Insurance 3d Sec. 126:2 (1995).

Los tribunales deben examinar, caso a caso, las alegaciones o reclamaciones del asegurado y compararlas con las cláusulas del contrato de seguro del caso en particular, para así poder determinar el deber, si alguno, de la compañía aseguradora de ofrecer representación legal al asegurado. Aguilar Pérez v. Universal Insurance Company, ante. Sin embargo, aun en aquellos casos en que el asegurador no esté obligado a asumir la representación legal del asegurado, no queda liberado de notificar a éste de su negativa a proveer tal representación, cuando la misma le fue solicitada. González v. The Commonwealth Ins. Co., 140 D.P.R. 673 (1996). Tal deber de notificación es consecuencia del principio de buena fe de los contratantes. Id.

Finalmente, en nuestra jurisdicción prevalece la norma de que cuando un asegurador incumple su deber contractual de asumir la representación legal del asegurado, este último podrá demandarlo por incumplimiento de contrato y recobrar las costas del litigio y los honorarios de abogados en la litigación. PFZ Properties v. General Accident Ins. Co., ante.

V

A

Expuesta la normativa general vigente en materia de seguros, pasamos a examinar el contrato de seguro de título, en particular. La póliza de título es la única forma de seguro que se originó en los Estados Unidos, específicamente en la segunda mitad del Siglo XIX. 1 Palomar, Title Ins. Law Sec. 1:1; 1-1 Appelman on Insurance Sec. 1.31. La misma surgió con el propósito de garantizar las transferencias de propiedad inmobiliaria y, por ende, que el título asegurado se pudiera mercadear, ello porque en el sistema de derecho del "common law" no se contemplan registros confiables de bienes inmuebles y tanto los "title abstracts" como los "attorney title opinions" y los "title guarantees" habían advenido insuficientes.[10] E. Vázquez Boté, El denominado

---

[10] Los title abstracts eran opiniones escritas de escribanos del common law, basadas en la investigación del historial de un inmueble en los archivos aplicables. A su vez, las opiniones de abogados eran producto del análisis que hiciera el letrado del title abstract. Si se evidenciaba que el

(Continúa . . .)

seguro de títulos: Ventajas e inconvenientes de su adopción en el Derecho español, XCII Rev. Der. Not. 221 (1976); A.W. Beatie & A.R. Kleven, The Devil in the details: Water Rights and Title Insurance, 7 U. Denv. Water. L. Rev. 381 (2004); C.B. DeWit, Title Insurance: A Primer, 3 Tenn J. Prac. & Proc. 15 (2000).

El seguro de título ha sido definido como un contrato en cuya virtud el asegurado le paga una prima al asegurador a cambio del compromiso de este último de indemnizarle en caso de que el primero sufra una pérdida, causada por gravámenes o defectos, en un título inmobiliario sobre el cual obtiene un interés. 1 Palomar, ante, Sec. 1:8. Véase, además: 1-1 Appleman on Insurance Sec. 1.31; Pérez Sánchez v. Advisors Mortgage Investors, Inc., 130 D.P.R. 530. El seguro de título, también, ha sido frecuentemente descrito como:

> the opinion of the insurer concerning the validity of the title, backed by an agreement to make that opinion good if it should prove to be mistaken and a loss should result in consequence. *Id.* Laabs v.

---

abogado o el escribano habían cometido un error el comprador tenía una acción en daños, pero solamente si los primeros habían actuado de modo negligente. Véase: 1 Palomar, ante, Sec. 1:3; A.W. Beatie & A.R. Kleven, ante. Por otro lado, las *title guarantees* eran emitidas por compañías que garantizaban al adquirente que su interés sobre el inmueble no tenía defectos, salvo aquellos gravámenes enlistados. Hosak, California Title Ins. Practice 2 (1980). La única diferencia entre las *title guarantees,* los *title abstracts* y las *attorney opinions* es que en la primera el adquirente no tenía que demandar por negligencia para recobrar la indemnización como ocurría en los últimos dos casos. Sin embargo, ninguno de estos métodos protegía al adquirente más allá de lo que surgiera de los archivos públicos inmobiliarios. 1 Palomar, ante, Sec. 1:4.

Chicago Title Ins. Co., 241 N.W. 2d 434, 438 (1976).

No obstante, y a pesar de ser cierto que las compañías que emiten este tipo de seguro realizan un estudio de título antes de redactar la póliza, a diferencia de los "*title abstracts*" o "*_tronéis opinions*", dicha investigación tiene como propósito el propio beneficio de la empresa. 1 Palomar, ante, Sec. 1:8. Ello, porque el descubrimiento de un defecto en particular durante el estudio tiene el solo propósito de que la compañía aseguradora decida corregirlo antes de emitir la póliza, exceptuarlo de la misma o asumirlo. *Id.*

Como podemos deducir de lo antes expuesto, los seguros de título, a diferencia de otros tipos de seguros, se caracterizan por tener un elemento de prevención o eliminación de riesgo más allá de la asunción o distribución del mismo. 1 Palomar, ante, Sec. 1.15. Esto es, como norma general, los seguros de título ofrecen cubierta por pérdidas futuras a causa de gravámenes o defectos en el título anteriores a la fecha de emisión de la póliza. 1 Palomar, ante, Sec. 1.16. Dicho de otra manera, el seguro de título "proporciona cobertura al asegurado contra el riesgo de que, después de la adquisición, se descubra que en el título del enajenante ya existía, en el momento de contratar el seguro, un defecto que podía privar de su derecho al adquirente." J. Puig Brutau, El seguro a favor del adquirente de bienes inmuebles en los Estados Unidos, XCIII-XCIV Rev. Der. Not. 254 (1976).

B

En Puerto Rico, el seguro de título no ha sido regulado más allá de la siguiente definición que ofrece el Código de Seguros:

> …el seguro de dueños de propiedad inmueble o mueble u otros que tengan interés o gravámenes o cargas sobre la misma, contra pérdida por gravamen, títulos defectuosos o invalidez o reclamación adversa al título, y los servicios correspondientes. Art. 4.100 del Código de Seguros, 26 L.P.R.A. sec. 410.

En Pérez Sánchez v. Advisors Mortgage Investors, ante, afirmamos que, de la definición antes citada, se desprende que existe más de una modalidad del seguro de título; la más común de ellas, y sobre la cual nos pronunciamos en el citado caso, es el seguro de hipoteca. Éste tiene el propósito de indemnizar al asegurado prestamista en caso de pérdida de la prioridad registral de la hipoteca. *Id.* Véase: J.M. Pedowitz, *Title Insurance and You: What Every Lawyers Should Know!,* ABA Press, (1979).

La otra clase de seguro de título, y sobre la cual hoy nos expresamos por primera vez, es el seguro de dueño o el contrato de seguro con póliza de propietario, el cual se utiliza para cubrir riesgos en los negocios de transmisión de un interés inmobiliario, excepto en aquellos ya cubiertos por el seguro de hipoteca. Vázquez Bote, ante, pág. 287; Pérez Sánchez v. Advisors Mortgage Investors, ante. En otras palabras, estas pólizas se utilizan para garantizarle el

título al adquirente de una propiedad inmueble en caso de que sufriera una pérdida o menoscabo en su derecho. *Id.*

Al igual que en otros países donde predomina el derecho registral inmobiliario de índole civilista, en Puerto Rico se ha cuestionado la necesidad o conveniencia de los seguros de título debido a la existencia, en nuestro ordenamiento, del Registro de la Propiedad y sus garantías. A pesar de ello, se ha entendido que la protección que ofrece el seguro de título es más extensa que la brindada por tal registro inmobiliario. Pérez Sánchez v. Advisors Mortgage Investors, ante.

Además, el seguro de título le brinda tranquilidad al asegurado por errores o inadvertencias en el estudio de título, así como por inexactitudes provocadas por documentos presentados con posterioridad a la investigación en el Registro de la Propiedad. Un seguro de este tipo, a su vez, provee seguridad al adquirente de un título presentado en el registro que aun no ha sido calificado e inscrito.[11] B. Arruñada, A Transaction-Cost View of Title Insurance and its Role in Different Legal Systems, The Geneva Papers of Risk and Insurance, Sec. 27:4, (2002). Las aseguradoras privadas

---

[11] Este fundamento tiene mayor sentido ante los considerables retrasos que enfrenta el Registro de la Propiedad en la inscripción de documentos. Véase: Informe especial sobre evaluación de las secciones que componen el Registro de la Propiedad de Puerto Rico sobre la efectividad de su función, Oficina del Contralor de Puerto Rico, 1 de octubre de 2007.

cubren el riesgo en el periodo que media entre la presentación y la calificación.[12] *Id.*

Por último, y en relación al seguro de hipoteca, se ha afirmado que éste responde a una necesidad del mercado para que los prestamistas en Puerto Rico puedan vender las hipotecas aquí autorizadas en los Estados Unidos. J.E. Fernández Seín, Las pólizas de seguro de título de la propiedad en Puerto Rico:¿Son realmente necesarias?, Tesis, Facultad de Derecho, U.P.R., 1966.

C

Con el anterior trasfondo doctrinal en mente, pasamos a analizar las cláusulas de exclusión que son motivo de la controversia de epígrafe.

La función de las cláusulas de exclusión de una póliza de seguro es eliminar la responsabilidad que tiene el asegurador de indemnizar por pérdidas resultantes de los riesgos excluidos. 1 Palomar, ante, Sec. 6.1. Para evitar que las compañías aseguradoras sean responsables por defectos en el título de los asegurados que, comúnmente, no

---

[12] De hecho, en Puerto Rico las pólizas son, en promedio, un 20% más baratas que en los Estados Unidos, quizás como consecuencia de que aseguran, principalmente, el periodo entre la presentación y la calificación. B. Arruñada, El seguro de títulos de propiedad: naturaleza y perspectivas de desarrollo en los Estados Unidos y en Europa, XIII Congreso del Centro Internacional de Derecho Registral, Punta del Este, marzo de 2001. Ello, claro está, debido a la naturaleza de las pólizas de título en las que normalmente se paga una única prima que provee cobertura indefinida. 1 Palomar, ante, Sec. 1:17.

pueden ser descubiertos mediante una investigación de título o por defectos que fueron en parte producto de las actuaciones del propio asegurado, la American Land Title Association (ALTA) ha diseñado unas pólizas estándares que contienen exclusiones preimpresas a tales efectos.

En aquellos casos en que la aseguradora interesa exceptuar de la cubierta un riesgo particular, no excluido en la póliza preimpresa, tiene que hacerse constar mediante el endoso correspondiente.[13] Por el contrario, cuando existe algún defecto en el título que queda excluido por la póliza estándar y los contratantes acuerdan incluirlo en la cobertura, se tiene que hacer un endoso con dicho propósito. Véase: 1 Palomar, ante, Cap. 9.

La póliza de seguro de título hoy ante nuestra consideración es una estándar o impresa igual a las emitidas por la ALTA. Por consiguiente, las cláusulas de exclusión que analizaremos han sido discutidas extensamente por los tratadistas y los tribunales en Estados Unidos. Al respecto, debe recordarse que es norma reiterada por este Tribunal que, al resolver controversias sobre interpretación de cláusulas de pólizas de seguros, las normas de derecho angloamericano son de gran valor persuasivo en nuestra jurisdicción, ello porque las pólizas de seguro que se

---

[13] Un endoso es el acuerdo por escrito que se adhiere a la póliza para que forme parte del contrato con el propósito de alterar, ampliar o restringir la cubierta que dispone la póliza. R. Cruz, Derecho de Seguros, San Juan, Publicaciones JTS, 1999, pág. 368.

mercadean en Puerto Rico, de ordinario, son modelos semejantes o idénticos a las que venden las compañías de seguros de los Estados Unidos. Domínguez Vargas v. Great American Life Assurance Company of Puerto Rico, Inc., 157 D.P.R. 690 (2002). Meléndez Piñero v. Levitt & Sonso of Puerto Rico, 129 D.P.R. 521 (1991); máxime cuando nos referimos a los seguros de títulos que, como expresáramos antes, es la única forma de seguro que nació y se desarrolló, primordialmente, en los Estados Unidos.

Antes de analizar cada cláusula por separado, es menester señalar que es el asegurador quien debe demostrar, por preponderancia de la evidencia, que el defecto o gravamen queda excluido de la póliza. First Nat. Bank of Minneapolis v. Fidelity nat. Title Ins. Co., 572 F.2d 155 (1978). De la misma forma, el asegurado tiene que probar que concurren los hechos necesarios para que proceda una excepción a una exclusión.

La primera cláusula que analizaremos es aquella que excluye de la cobertura pérdidas que sean producto de violaciones a regulaciones estatales sobre el uso del terreno, como lo son las ordenanzas de zonificación y los códigos de edificación. Tal exclusión, a su vez, encuentra una excepción cuando el defecto o gravamen que causa la pérdida surgiera, a la fecha de emitirse la póliza, de los archivos públicos ("public records").

Los tribunales federales han interpretado que una violación a una ordenanza de zonificación, a diferencia de

la mera existencia de la regulación, constituye un gravamen que torna el título inmercadeable. Véase: Hunter Broadcasting, Inc. v. City of Burlington, 670 A. 2d 836 (1995); New England Federal Credit Union v. Stewart Title Guarantee Co., 765 A 2d 450 (2000). Una segregación contraria a la zonificación del área, en definitivo, es una violación a las ordenanzas estatales sobre el uso del terreno. Véase: Nishiyama v. Safeco Title Ins. Co., 85 Cal. App. 3d Supp. 1 (1978); Bush v. Nervik, 687 P. 2d 872 (1984); Bianchi v. Lorenz, 701 A 2d 1037 (1997). En dicha situación, el título del inmueble es inmercadeable porque, inclusive, el mismo no es legalmente transferible.[14] New England Federal Credit Union v. Stewart Title Guarantee Co., ante.

Al tratarse de un gravamen que convierte el título en inmercadeable, la compañía aseguradora estaría obligada a indemnizar si el defecto no se excluyera de la cobertura. Por lo tanto, debemos examinar qué constituyen archivos públicos ("public records") a los fines de identificar cuáles defectos quedarían exceptuados de la exclusión.

Antes de 1992, se entendía que los archivos públicos eran "aquellos que por ley impartían conocimiento

---

[14] Un título mercadeable es aquel que una persona razonable no dudará en adquirir porque garantiza que la propiedad está libre de gravámenes. Véase: Blacks Law Dictionary 711 (2d Pocket ed 2001); J.P. Wilde, Comment: Violations of Zoning Ordinances, the Covenant Against Encumbrances and Marketability of Title: How Purchasers can be Protected?, 23 Touro L. Rev. 199 (2007).

constructivo sobre materias relacionadas a la propiedad inmueble." (Traducción nuestra.) Al interpretar esta definición, en Hahn v. Alaska Title Guaranty Co., 557 P. 2d. 143 (1976), se resolvió que el concepto archivo público no excluía una orden de propiedad de dominio público archivada en la oficina del *Federal Registrar* en Washington DC. Por otro lado, en Rodavanov v. Land Title Co. of Am., 545 N.E. 2d 351 (1989), se interpretó que los archivos públicos incluían los registros del tribunal de circuito del condado.

Con el propósito de limitar la extensión del significado de los *public records*, en 1992 la ALTA enmendó la definición del mismo en las pólizas estándares. La nueva versión, que es la incluida en la póliza hoy en controversia, lee de la siguiente forma:

> …los archivos establecidos por estatutos estatales a la fecha de emisión de la póliza con el propósito de impartir conocimiento constructivo, sobre las materias relativas a la propiedad inmobiliaria, a los compradores por valor y sin conocimiento actual. (Traducción nuestra.)

Al interpretar esta definición, en New England Federal Credit Union v. Stewart Title Guarantee Co., ante, no obstante aceptar que el concepto era más limitado que el analizado por los tribunales de Illinois y Alaska, concluyó que el texto enmendado claramente incluía los archivos de una agencia pública que prohibía emitir ciertos permisos de construcción. Es decir, el tribunal resolvió que los archivos que impartían conocimiento constructivo bajo los

estatutos de Vermont no se limitaban a los documentos que surgían del archivo municipal de propiedad inmueble.

Al así concluir, el tribunal distinguió el caso ante su consideración de lo resuelto en Somerset Savings Bank v. Chicago Title Ins. Co., 649 N.E. 2d 1123 (1995), a los efectos de que los archivos de zonificación no constituían archivos públicos desde el punto de vista de la excepción de la póliza ya que en Somerset la propia póliza interpretada afirmaba que la definición de archivo público no incluía archivos en oficinas locales, estatales o federales de protección ambiental, zonificación, edificación, seguridad o salud pública. *Id.*

En el presente caso nos corresponde analizar la interpretación que se le ha dado a una de las cláusulas más litigadas en materia de contratos de seguro de título, esto es, aquella que excluye de la cobertura de la póliza materias creadas, toleradas, asumidas o acordadas por el demandado. Como umbral, debe enfatizarse que la mayoría de los tribunales han decidido que las compañías aseguradoras no pueden invocar esta excepción salvo que la conducta del asegurado, que causó la pérdida, fuera una intencional o con conocimiento. 1 Palomar, ante, Sec. 6.10. Véase, además: National Mortg. Corp. v. American Title Ins. Co., 255 S.E 2d 622 (1979); American Sav. and Loan Association v. Lawyers Title Ins. Corp., 793 F.2d 780 (6th Cir 1986). Más aun, la mayoría de las decisiones han requerido, como norma general, que el asegurado conozca los hechos y prevea los resultados

del caso. Mid-South Title Ins. Corp. v. Resolution Trust Corp, 840 F. Supp. 522 (1993). National Credit Union Administration v. Tcor Title Ins. Co., 873 F. Supp. 718 (1995).

El concepto del daño creado por el asegurado ha sido interpretado de manera que requiere un acto consciente, deliberado y afirmativo del asegurado, dirigido a producir la reclamación en controversia. Safeco Title Ins. Co. v. Moskopoulos, 116 Cal. App. 3d 658 (1981); Sims v. Sperry, 835 P. 2d 565 (1992). Además, es necesario que dicho acto haya causado el defecto, gravamen o reclamación adversa del título asegurado. American Sav. and Loan Association v. Lawyers Title Ins. Corp., ante.

Por otro lado, el término tolerado (suffered) por el asegurado se ha entendido que es sinónimo de permitir, dejar o acceder. National Credit Union Administration v. Tcor Title Ins. Co., ante. Se ha interpretado que dicho concepto parece suponer una omisión de parte del asegurado de actuar para prevenir la reclamación. Mid-South Title Ins. Corp. v. Resolution Trust Corp, ante.

El tercer concepto que incluye la cláusula es el de asumir. Sobre el mismo se ha afirmado que se requieren ambos, conocimiento e intención, para asumir un defecto específico. First Nat. Bank and Trust Co. of Port Chester v. New York Title Ins. Co., 12 N.Y.S. 2d 703 (1939). En Mid-South Title Ins. Corp. v. Resolution Trust Corp, ante, se resolvió que un asegurado no asume un gravamen meramente

porque haya tomado la propiedad "sujeta a" cualquier gravamen. Ello quiere decir que se requiere el conocimiento específico del defecto asumido. National Credit Union Administration v. Ticor Title Ins. Co., ante. Sobre el particular, en Arizona Title Insurance & Trust Co. v. Smith, 219 P. 2d 860 (1974), se estableció que para que proceda la exclusión, la aseguradora tiene que demostrar que el contrato específicamente describía el gravamen o que el asegurado tenía conocimiento actual del mismo antes de la compra.

Por último, debemos considerar el tratamiento que se le ha dado al vocablo acordar (agreed). El mismo se ha entendido que concurre cuando las partes acuerdan aceptar un gravamen o defecto particular en el título, con conocimiento de su extensión y cantidad. First Nat. Bank of Minneapolis v. Fidelity nat. Title Ins. Co., ante. Este término tiene connotaciones de "contratado," es decir, que el asegurado contrató para aceptar el gravamen conocido. National Credit Union Administration v. Ticor Title Ins. Co., ante.

Algunas de las circunstancias que los tribunales estadounidenses han identificado para colegir si un asegurado ha asumido o acordado un defecto o gravamen en su título, son las siguientes: si antes de la compra el asegurado está consciente del gravamen; si el asegurado acuerda expresamente en el contrato asumir el gravamen; si obtuvo una reducción en el precio de compra por asumir el riesgo; o si descansó en la aseguradora para que cubriese el

defecto o gravamen. Véase: <u>Green v. Sams</u>, 433 S.E. 2d 678 (1993); <u>Malkin v. Realty Title Ins. Co.</u>, 223 A. 2d 155 (1966).

En conclusión, la mayoría de los casos que confeccionan los cuatro conceptos que acabamos de discutir, con el propósito de decidir si la póliza ofrece cobertura por la pérdida sufrida, se han enfocado en: (1) si el lenguaje en el contrato o escritura de compraventa sugiere que el asegurado conocía del gravamen o defecto y su intención de recibir el título sujeto al mismo; y en (2) si el asegurado asumió contractualmente una obligación para efectuar algún acto y luego no lo hizo. 1 Palomar, ante, Sec. 6.12, citando a Eliis, <u>Title Insurance Law Handbook</u>, 335 (1987).

V

En esencia, en el presente caso debemos resolver si quedan excluidas de la cobertura de un seguro de título pérdidas causadas por un defecto en el título de propiedad de un inmueble, relacionado a una violación de una ordenanza de zonificación, cuando tal defecto surgía de los archivos públicos de la Junta de Planificación. Nos toca decidir, además, si una advertencia en la escritura de compraventa de un inmueble, sobre la existencia de un defecto en el título, significa que el adquirente asumió o acordó tal gravamen. Por último, debemos pronunciarnos sobre si, ante las circunstancias descritas, una compañía aseguradora tenía la

obligación de ofrecer representación legal al asegurado en un pleito relacionado al defecto en cuestión.[15]

A

No existe controversia sobre si el defecto en el título de los esposos Echandi-Guzmán era producto de una violación a la zonificación del área donde estaba ubicado el inmueble que adquirieron. A su vez, la póliza excluye de la cubierta del seguro aquellos defectos relacionados con ordenanzas de zonificación. Por consiguiente, a primera vista parece ser que las pérdidas que sufriera el asegurado se encuentran excluidas por dicha cláusula. No obstante, el contrato de seguro, a su vez, hace una excepción a la exclusión referida: cuando el defecto surge de los archivos públicos, establecidos por leyes estatales vigentes a la fecha de emisión de la póliza con el propósito de impartir conocimiento constructivo sobre materias relacionadas a propiedades inmuebles.

---

[15] Stewart Title nos solicita que excluyamos y no consideremos en nuestro análisis los últimos tres errores señalados por el peticionario, ya que los mismos no fueron presentados ante el tribunal de instancia, ni ante el Tribunal de Apelaciones. Es norma vigente en nuestra jurisdicción que en apelación nos abstendremos de adjudicar cuestiones no planteadas ante el tribunal de instancia. Trabal Morales v. Ruíz Rodríguez, 125 D.P.R. 340 (1990); Dorante v. Wrangler of P.R., 145 D.P.R. 408 (1998) (Op. Concurrente del Juez Rebollo López). Encontrándonos impedidos en etapa de revisión de pasar juicio sobre cuestiones no presentadas ni atendidas por los tribunales inferiores, los referidos errores no serán considerados al disponer del presente recurso.

Ante tal situación, debemos evaluar la extensión del concepto archivo público a los efectos de la póliza de seguro. Alega Stewart Title que el referido término se limita en Puerto Rico al Registro de la Propiedad. Sin embargo, y como expresáramos antes, los tribunales estadounidenses han resuelto que dicho concepto incluye los archivos públicos que conserva el Estado relativos a la zonificación o edificación del territorio, salvo que quede expresamente excluido de la póliza. Definitivamente, los archivos públicos que mantiene la Junta de Planificación sobre la zonificación de Puerto Rico son establecidos por estatutos estatales que existían a la fecha de la emisión de la póliza con el propósito de dar publicidad sobre materias relacionadas a propiedad inmobiliaria.

Además, el procedimiento de obtención de un mapa certificado de zonificación en Puerto Rico es uno bastante sencillo y económico. Para conseguirlo sólo hay que visitar la oficina de la Junta de Planificación, en el Centro de Gobierno Roberto Sánchez Vilella, con la descripción exacta del inmueble y pagar una tasa de siete dólares. Esto, definitivamente, no es una exigencia que podamos catalogar como onerosa para una compañía aseguradora.

Es un arraigado principio de interpretación de contratos de seguros, que éstos siempre deben ser interpretados a favor del asegurado. También, las cláusulas de exclusión deben interpretarse restrictivamente. Existiendo dos posibles interpretaciones, debemos

seleccionar aquella más favorable al asegurado. Por ende, somos del criterio que el término archivo público incluye aquellos que conserva la Junta de Planificación en sus oficinas. A pesar de que el defecto que tienen los Echandi-Guzmán en su título de propiedad es uno relativo a la zonificación del inmueble, lo cual queda excluido de la póliza, aquí opera la excepción a dicha exclusión. Ello porque al momento de la emisión de la póliza, el defecto en cuestión surgía de los archivos públicos de la Junta de Planificación.

B

La compañía aseguradora, además, alega que las pérdidas causadas por el defecto en el título no están cubiertas por la póliza de seguro ya que el asegurado acordó o asumió indirectamente el defecto en el título, al suscribir una escritura de compraventa que le advertía sobre el mismo.[16] Al observar el significado que se le ha dado a los términos creado y tolerado, resulta claro que no son de aplicación a la presente situación. Por ende, debemos resolver si el aquí asegurado acordó o asumió el defecto, de acuerdo a la doctrina antes esbozada.

Según surge de la situación de hechos, el presente caso fue resuelto de manera sumaria por los tribunales

---

[16] No está en controversia que la compañía aseguradora también conocía del defecto en el título al momento de emitir la póliza de seguro.

inferiores, es decir, no se ha celebrado una vista en su fondo sobre las controversias planteadas. Stewart Title solicitó que se dictara sentencia sumaria descansando solamente en la escritura de compraventa y en la póliza de seguro de título. Los tribunales que se han enfrentado a cláusulas idénticas a la aquí en cuestión, en su mayoría, han resuelto que para entender que un asegurado asumió o acordó un defecto o gravamen es necesario que se pruebe que este último conocía del mismo y que, además, tenía intención de asumirlo o acordarlo.

La compañía aseguradora alega que en la escritura de compraventa, que suscribió el asegurado, la Notaria hizo una advertencia sobre el defecto en el título. No obstante, de los documentos en el expediente no surge que el asegurado conocía la extensión y efectos que podía causar dicho defecto. Tampoco se puede colegir que los Echandi-Guzmán estaban conscientes del defecto antes de la compraventa. Por último, de los documentos que acompañan la moción de sentencia sumaria no se puede inferir que los peticionarios tenían la intención de asumir o acordar los riesgos en torno al defecto. Adviértase que hemos resuelto reiteradamente que, en el sano ejercicio de su discreción, un tribunal debe abstenerse de resolver sumariamente controversias sobre temas de alto interés público, como lo son aquellas relativas a contratos de seguros.

En vista de todo lo antes expuesto, procede devolver el caso al tribunal de instancia para que celebre una vista en

su fondo en la que se determine, de acuerdo a la doctrina aquí esbozada, si los esposos Echandi-Guzmán asumieron o acordaron el gravamen en cuestión. Si lo hicieron, procede declarar que la póliza de seguros no ofrece cobertura por las pérdidas sufridas en su título a causa del defecto. Si, por el contrario, el matrimonio no acordó ni asumió el defecto aquí en cuestión, procede declarar que la póliza de seguros les ofrece cobertura por las pérdidas resultantes del mismo.

## C

Nos queda por resolver si la compañía aseguradora incumplió con su obligación de proveer representación legal al asegurado. Como norma general, un tribunal debe analizar si de una interpretación liberal de las alegaciones de la demanda surge que el daño esta cubierto por la póliza, o si por el contrario, la cubierta de póliza claramente lo excluye. Es menester recordar que cualquier duda sobre si existe el deber de asumir la defensa en un caso en particular tendrá que ser resuelta a favor del asegurado.

A diferencia de los casos donde hemos desarrollado dicha norma, en los hechos particulares hoy ante nuestra consideración no se trataba de una demanda incoada contra los asegurados, sino de una sentencia parcial emitida por un tribunal que afectaba negativamente a éstos. Por lo tanto, el interés de los asegurados era intervenir en el pleito para proteger su título. Con dicho propósito, los asegurados

se comunicaron insistentemente con la aseguradora, de acuerdo a lo requerido en el contrato. Sin embargo, Stewart Title ni siquiera contestó las cartas que le enviaron los esposos Echandi-Guzmán solicitándole representación legal. La compañía aseguradora nunca les informó a sus clientes su posición al respecto, es decir, que alegadamente no estaba obligada a brindarle cobertura ni representación legal tomando en cuenta los hechos del caso, todo ello en contravención al principio general de la buena fe reconocido en nuestro ordenamiento.

Ante la falta de contestación de Stewart Title a sus súplicas, los esposos Echandi-Guzmán tuvieron que intervenir en el pleito Ramos v. Rivera, para proteger su derecho. Es cierto que la póliza de seguro expone que es la compañía aseguradora quien tiene el derecho de presentar una acción o iniciar un procedimiento para proteger el título del asegurado, cuando éste no ha sido demandado. Sin embargo, en una situación como la presente, en la cual la compañía aseguradora se ha cruzado de brazos ante la notificación del asegurado, ésta debe pagar por los gastos, costas y honorarios en que incurra el mismo para defender su derecho.

Por otro lado, al momento en que los esposos Echandi-Guzmán le solicitaron a la compañía aseguradora representación legal no estaba claro si la póliza de seguro cubría o no las pérdidas causadas. Todavía ello no ha sido resuelto.

Por los fundamentos expuestos, resolvemos que Stewart Title debe reembolsarle a los esposos Echandi-Guzmán las sumas que estos invirtieron en costear su intervención en el pleito Ramos v. Rivera. Tal monto incluirá los gastos y honorarios de abogados.

## VI

En mérito de todo lo antes expuesto, procede dictar Sentencia revocatoria de la emitida por el Tribunal de Apelaciones y devolver el caso al Tribunal de Primera Instancia para procedimientos ulteriores consistentes con lo aquí resuelto.

Se dictará Sentencia de conformidad.


                    FRANCISCO REBOLLO LÓPEZ
                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Efraín Echandi Otero y otros

    Peticionaria

        vs.                     AC-2006-49     *CERTIORARI*

Stewart Title Guaranty Co.

    Recurrido

SENTENCIA

San Juan, Puerto Rico, a 22 de julio de 2008

Por los fundamentos expuestos en la Opinión que antecede, se dicta Sentencia revocatoria de la emitida en el presente caso por el Tribunal de Apelaciones y se devuelve al Tribunal de Primera Instancia, Sala Superior de San Juan, para procedimientos ulteriores consistentes con lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton disintió sin opinión escrita. La Juez Asociada señora Rodríguez Rodríguez emitió Opinión disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Efraín Echandi Otero y
otros

    Apelantes

       v.                           AC-2006-49

Stewart Title Guaranty
Company y otros

    Apelados

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 22 de julio 2008

Este caso nos brinda la oportunidad de expresarnos nuevamente sobre la naturaleza y alcance de la figura estadounidense del seguro de título. Tenemos ante nuestra consideración la modalidad del seguro de título que se denomina "el seguro de dueño o el contrato de seguro con póliza de propietario", que se utiliza para cubrir riesgos en los negocios de transmisión de un interés inmobiliaro. Véase, *Pérez v. Advisors Mortage Investors*, 130 DPR 530, 540 (1992). Específicamente, debemos pasar juicio sobre la cláusula de exclusión de este contrato.

Contrario a la conclusión a que llega la mayoría, soy del criterio que uno de los incisos de la

cláusula de exclusión del contrato de seguro que interpretamos veda la cobertura en este caso.    En consecuencia, disiento del dictamen de este Tribunal y confirmaría al Tribunal de Apelaciones.

Los hechos de este caso se encuentran resumidos en la Opinión mayoritaria por lo que estimo innecesario repasarlos en estos momentos.

**I**

**A**

La aparición de los seguros de títulos acontece en los en Estados Unidos a finales del siglo XIX.  Su finalidad  fue la de cubrir el riesgo económico inherente a la inseguridad que pesaba sobre los títulos.  Tanto propietarios, como acreedores que prestaban con garantía hipotecaria, exigían de un seguro contra los defectos que el título pudiera padecer y que a la vez, amparara los costes de defenderlo judicialmente.

El seguro de título ha sido definido como "un contrato por el cual una entidad aseguradora se compromete a indemnizar al titular de un derecho real en caso de que el título asegurado se demuestre defectuoso y a asumir, en su caso, la defensa jurídica de derecho título." B. Arruñada, *El seguro de título de propiedad*, 80 *Revista Crítica de Derecho Inmobiliario* 53 (2004).  El contrato de seguro de título es, en su esencia, un convenio de indemnización,  pues "la aseguradora se obliga a indemnizar al asegurado en el caso de que éste tuviera alguna pérdida causada por acciones incoadas por un tercero." C. Odriozola Maariscal, *El Seguro*

*de Título Inmobiliario*, J.M. Bosch Editor, Editorial México Universitario, México D.F., 2006, pág. 39. "Consecuentemente, un asegurador de título no 'garantiza' el estatus del título del garante. Como un contrato indemnizatorio, el asegurador se obliga a cubrir al asegurado las pérdidas o daños resultado de problemas en el título, en cuanto que la cobertura de esos daños no se encuentre excluida en la póliza." *Íbid*, pág. 38, n. 6.

En *Pérez v. Advisors Mortage Investors, supra*, pág. 539, dijimos, que este seguro proporciona cobertura al asegurado contra el riesgo de que, **"después de la adquisición**, se descubra que en el título del enajenante ya existía, en el momento de contratar el seguro, un defecto que podía privar de su derecho al adquirente." A pesar de su importancia, llama la atención la escasa regulación a que ha sido sometido, muy en particular en Puerto Rico. E. Vázquez Bote, El denominado seguro de títulos, Ventajas e incontentes de su adopción en el Derecho español, *Revista de Derecho Notarial*, 1976, núm. XCII, 221, 275.

Luego de estos lineamientos generales sobre el seguro de título, paso a discutir la cláusula de exclusión de cubierta objeto de litigación.

**B**

Soy del criterio que la sección 3(a) de la cláusula de exclusión del contrato de seguro de título aplica en este caso, y como resultado de ello, el asegurado no tiene un reclamo válido en contra de su aseguradora. La cláusula en cuestión dispone:

The following matters are expressly excluded from
Coverage of this policy and the Company will not
pay loss or damage, costs, attorneys' fees or
expenses which arise by reason of:

. . .
   3.     **Defects**, liens, encumbrances, **adverse
          claims** or other matters:

   (a) **Created, suffered, assumed or agreed to by
       the insured claimant.**

   (b) Not known to the company, not recorded in
       the public records at the date of policy,
       but known to the insured claimant and not
       disclosed in writing to eh Company by the
       Insured claimant prior to the date the
       insured claimant became an insured under
       this policy.

Por defectos o reclamaciones adversas según descritas en la cláusula que antecede, debemos entender, "la existencia de cualquier vicio que afecte la validez del título de propiedad, . . ., siempre que ese defecto sea desconocido a la fecha de expedición de la póliza." Odriozola, *op. cit.*, pág. 93. Es decir, el conocimiento del asegurado del vicio que pesa sobre su título opera para denegar cubierta. Ese conocimiento hace del riesgo uno no asegurado pues ha sido asumido por el asegurado. Con lo cual, somos del criterio que si de la escritura de compraventa suscrita en este caso surge que el asegurado conocía del defecto o de la reclamación adversa que pesaba sobre el inmueble que se adquiría y no obstante asumió el riesgo es decir, que su intención fue la de recibir el título sujeto a ese defecto, por lo que el seguro de título adquirido no cubre ese riesgo conocido y asumido.

En este caso, cuando los peticionarios otorgaron la escritura de compraventa número 18 y se expidió la póliza de seguro de título, se había ya instado un pleito en el Tribunal de Primera Instancia, del cual se desprendía el potencial vicio que se ceñía sobre el título del inmueble que se adquiría. En esta demanda se había impugnado los permisos que aprobaron el desarrollo de Vista Bahía y, en consecuencia, la validez de la segregación del solar de mil metros de la finca principal, cuya segregación y compraventa se pretendía llevar a cabo mediante la escritura número 18. Véase, *Ana Ramos Toro v. Carlos A. Rivera Bustamante*, KPE2002-0190 (904). En la propia escritura de compraventa, la notario hizo referencia al referido litigio indicando, entre otras cosas, que en el mismo, "se ha cuestionado la legalidad de lo [sic] permisos gubernamentales concedido [sic] en relación con el proyecto." La notario a su vez, le informó a la parte compradora "de la conveniencia de examinar los autos del mencionado caso previo al otorgamiento de esta escritura, en cuyo caso se puede posponer el cierre…." No hay duda entonces que el referido litigio arrojaba peligrosa sombra sobre la validez del título que se adquiría y ese hecho era conocido por los compradores. Siendo así, éstos lo asumieron.

De ordinario, establecer el conocimiento real del asegurado dependerá de la credibilidad que le merezca al juzgador el testimonio vertido en corte, salvo, claro está, que exista prueba escrita sobre el particular. Precisamente esa es la situación en este caso como ya vimos. *Couch on*

*Insurance,* 3d, sec. 159:81 ("Actual knowledge is extremely difficult to prove, and generally is base don the credibility of the insures. Absent written documentation, actual knowledge can only be proven through detailed depositions of the insured and related parties.") Necesariamente entonces, los compradores tuvieron conocimiento del riesgo potencial que se cernía sobre la propiedad que adquirían y asumieron el mismo, es decir consistieron a las consecuencias de la situación o riesgo expuesto en la escritura de compraventa, lo que es suficiente bajo los términos del contrato de seguro de título para negarle cubierta. Véase, *Couch on Insurance,* sec. 159:81("Actual knowledge of the insured is obviously sufficient to establish the applicability of the provisions excluding defects, claims or encumbrances existing at the date of the policy and known to the insured.")

Por su propia naturaleza, la póliza de seguro de título cubre **los riesgos desconocidos por el comprador a la fecha de su adquisición** y no asumir cualquier riesgo que pueda existir sobre la propiedad, más aún, cuando esos defectos o riesgos se excluyen expresamente en la cubierta y son conocidos por el adquirente.

El peticionario, invocando el inciso (b) de la sección 3 antes transcrita arguye, que la aseguradora conocía del referido pleito por lo cual no cabe hablar de que la póliza no ofrece la cubierta que se reclama. No coincidimos con esta interpretación, los incisos (a) y (b) de la sección 3 de la cláusula de exclusión, son separados y cubren distintos asuntos. Es decir, no se requiere que se cumpla

con lo dispuesto en el inciso (a) para activar la inciso (b). Con lo cual, la sección 3(a) tiene vida propia y separada de la sección 3(b). Los asuntos consentidos por el asegurado están expresamente excluidos de cubierta conforme la sección 3(a), independientemente que se los informara o no a su aseguradora. En estos casos, para que el asegurado tenga cubierta, tiene que haberse provisto de un endoso especial o declaración afirmativa de cubierta que incluya el riesgo conocido.

Además, una póliza asegura aquello que se describe o se incluye en el anejo a la póliza, denominado Schedule A. Es decir, el Schedule A define el título asegurado, la póliza de seguros no asegura un título más allá de lo allí provisto. En este caso este anejo hacía referencia a la escritura de compraventa, la aseguradora por lo tanto no aseguró un título más abarcador que el que adquirió la parte peticionaria mediante dicha escritura, con las limitaciones y riesgos aceptados en la misma escritura. Sostener lo contrario implicaría que con el seguro lo que se busca es "asegurar" las resultas del litigio.

En conclusión, soy del criterio que el propósito de las pólizas de seguro de título es cubrir solamente los riesgos desconocidos por el comprador a la fecha en que éste adquiere la póliza. El hecho de que los peticionarios consintieron al contrato de compraventa con pleno conocimiento de la existencia y naturaleza del pleito KPE2002-0190 (904), implica que ellos voluntariamente asumieron y consintieron al riesgo, en relación al seguro de título, de un resultado

adverso en este pleito.  Ante la ausencia de un endoso especial que pudiera cubrir este riesgo, forzoso es concluir que procedía desestimar el reclamo instado por los aquí peticionarios.


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada